## UNITED STATES *v.* MOYERS and others.

*(Circuit Court, W. D. Tennessee. December 23, 1882.)*

CRIMINAL LAW—WITHHOLDING PENSION—ILLEGAL FEES; REV. ST. § 5485.

> Any scheme or contrivance by which, under the guise of a loan or other dealing, the claim agent or attorney retains more than his legal fee, is a violation of the statute against withholding pension money or taking illegal fees. And while the pensioner, who has unconditionally and without restraint or limitation received the money, may do with it what she pleases,—except to pay the attorney a larger fee for his services than allowed by law,—may lend it to him, or buy property from him with it, these transactions must be with the utmost good faith, and no use of them to evade the statute will be tolerated.

Criminal Information.

This was a criminal information against Gilbert and George C. Moyers, in which they are jointly charged with demanding, receiving, and retaining from a pensioner illegal fees as her attorneys in the prosecution of her claim, and also with unlawfully withholding from her a portion of her pension money in violation of the provisions of section 5485 of the Revised Statutes.

On motion of the defendant George C. Moyers, supported by affidavits, a severance was granted, and thereupon Gilbert Moyers was separately put upon his trial under a general plea of not guilty.

The trial of this case occupied six days, and was vigorously contested at every point, resulting in a mistrial. The witnesses examined on each side were numerous, and many questions were raised on objections to evidence, and by the efforts of both sides to impeach witnesses or their testimony. Only such features of the evidence are given in this report as will serve to explain that portion of the charge reported here, which relates to the construction of the statute and the character of the offense charged under it.

There was little or no contest on the proof showing that the claim of the pensioner, an old colored woman named Melvina Rogers, who can neither read nor write, was prepared in the claim office of the defendant Gilbert Moyers in this city, together with the proof in support of it, and was by him filed for allowance in the pension bureau at Washington, he being her attorney of record in the case there, and having also at the time an office in the latter city. Her pension was allowed, and the certificate thereof is dated December 12, 1881. Pensioners in this district are paid by the agency at Knoxville, Tennessee, and accordingly a voucher was sent from said agency to be executed by the pensioner for the arrears of pension money due her. This voucher was filled up at the defendant's office here by his brother, George C. Moyers, and executed by the pensioner, in which the agency was informed that the post-office address of the pensioner was "Care of 56 Court street, Memphis,"—that being the number and location of his office here. A check dated December 31, 1881, was thereupon issued by the United States pension agents at Knoxville, on the receipt of this voucher, for the sum of $1,674.13, and sent according to the above direction, and was received at the defendant's office from a letter-carrier. On Friday, January 6, 1882, the pensioner, on learning of the arrival of this check, went to the defendant's office to see about it, when and where she met both the defendants. After some conversation about getting the check cashed, George C. Moyers took it from the office and made an arrangement with a Mr. Lehman for his indorsement of the same in consideration of being paid 2 per cent. therefor, to which the pensioner assented, although there was some conflict in the proof as to why this assent was given. The money was then obtained from a bank here by Lehman, who retained his 2 per cent. (about $34) and handed the balance of the amount to George C. Moyers. During the most of this transaction the pensioner remained in the office with Gilbert Moyers in conversation with him about this pension matter, and on the arrival of George C. Moyers with the money it was all placed in her

hands, and she immediately handed back to one of them (the proof was conflicting as to which one) the sum of $400. The testimony was very conflicting as to the nature of the transaction about the $400; that of the government tending to show that it was exacted as compensation for the services of these men as her pension attorneys, and that of the defendant tending to establish that it was a voluntary loan. The pensioner then left the office with the balance of her money, but without receiving or requesting of either of these defendants any note, due-bill, receipt, or other written evidence whatever concerning this transaction about the $400, and without the same being tendered to her by either of them. The next day, Saturday, a son of the pensioner went to the office of these defendants and complained of his mother's dissatisfaction with what had occurred, and on the following day, Sunday, George C. Moyers went to the pensioner's house, when further talk about it was had, and thence George C. and this son went together to Gilbert Moyers' residence, where an angry conversation ensued, when finally Gilbert said he would have nothing more to do with it; his testimony tending to show that he directed his brother to return the money to the pensioner. The next day, Monday, January 9, 1882, Gilbert Moyers having that morning left Memphis for Washington, George C. Moyers paid back to the pensioner's son $100 of the money for his mother, and gave him for her his own individual promissory note payable to her, simply, for $300, and due one year from date, without interest. The note was antedated January 6, 1882. It was proven that Gilbert Moyers was wholly insolvent, and there was some conflict about the degree of George C. Moyer's solvency; the proof of the government tending to show that he had nothing in Tennessee subject to execution, and that of the defense, that he was amply good for the amount of the note.

After the institution of this case George C. Moyers paid the pensioner $300, the amounts of the above note, but no interest was paid thereon. The payment was publicly made in the office of the clerk of this court and in his presence, and the pensioner executed to Moyers a receipt for the $300 paid to her, the clerk attending to the matter for her, and preparing her receipt.

*Wm. F. Poston,* Dist. Atty., and *John B. Clough,* Asst. Atty., for the Government.

*H. C. Young* and *Geo. Gillham,* for defendant.

HAMMOND, J., (*charging jury orally.*) It is part of the history of this country that the government of the United States is more

liberal to its pensioners than any other government. I have seen it stated, and presume it is true, that the military pension roll of the government of the United States exceeds that of all the other civilized nations in the world. It is a matter which is known to you and to all of us that enormous sums are annually appropriated, amounting to many millions of dollars, to pay pensioners. ·

It is also a part of the history of these pension laws, that, owing to the depredations made upon the appropriations by parties who were not entitled to receive them, there came to be great scandals in the administration of the fund. Pension agents and parties who were interested in and about the collection and distribution of these funds, under the guise of collecting fees and being paid for their services in one way and another, pocketed a great deal of the money, so that it did not go to the purpose for which it was intended. In order to protect these pensioners congress enacted a series of laws, which have, from time to time, grown more rigid. They consist of two classes.

In the early administration of the law the checks and money were sent in the ordinary course of business to the attorneys engaged in collecting pensions. Congress subsequently enacted statutes which prohibited the sending of pension checks to the attorneys of the pensioners, and a system of laws and postal regulations which have been read and referred to in your hearing, making very stringent provisions against the delivery of these checks to agents and attorneys engaged in the collection of pensions. They cannot get possession of them except by some evasion of these statutes; and the books which contain the history of the prosecution of this class of offenses, show that there is always connected with these cases some method or scheme by which the laws protecting the delivery of the check are sought to be evaded, and the check diverted into the hands of the attorney or agent. To illustrate the strictness of those laws,—I am inclined to think when the postmaster of this city delivered the letter containing the check at the office of this defendant, he violated these statutes; and, if so, he could be prosecuted for delivering the letter at the office of Gilbert Moyers. He should have delivered it to the pensioner or some member of her family.

In addition to the laws which were designed to prevent the check from going into the hands of any other person than the pensioner, congress enacted others imposing penalties upon agents or attorneys for the violation of its policy, and its declared purpose that the money should go to the pensioner and not to the agent or attorney, except the small fee that was allowed for his services. At first that

fee might be fixed by agreement between the parties—the agent filing a duplicate copy of his contract with the pension-office—provided it did not exceed $25. Then the pensioner had some power to fix the amount within the limit. Congress ultimately repealed those provisions and enacted a more stringent law, that in all cases the agent or attorney should receive only $10 for his services. This may seem, and perhaps is, in some cases, a small compensation, but we have nothing to do with that; it is in the power of congress to do this, and it has said that in all cases the agent or attorney shall not receive a larger compensation for his services than $10. The object of this legislation was to fix a fee beyond which no one can go, and in order to enforce that statute, and see that it was not violated, congress has enacted this statute, (Rev. St. § 5485:)

"Any agent or attorney or other person instrumental in prosecuting any claim for pension or bounty land, who shall directly or indirectly contract for, demand or receive, or retain, any greater compensation for his services or instrumentality in prosecuting a claim for pension or bounty land than is provided in the title pertaining to pensions, or who shall wrongfully withhold from a pensioner or claimant the whole or any part of the pension or claim allowed and due such pensioner or claimant, shall be deemed guilty of a high misdemeanor, and, upon conviction thereof, shall, for every such offense, be fined not exceeding $500, or imprisoned at hard labor not exceeding two years, or both, at the discretion of the court."

On a former occasion, in the trial of one of these cases, I had occasion to say what I say to you now in the same way, about the policy of the government with regard to pension funds:

"The statute, you will perceive, prescribes the punishment for two offenses in relation to the prosecution of a claim for pension,—one, the contracting for, demanding, receiving, or retaining of a greater compensation for the agent's services than allowed by law; the other, the withholding by the agent of the whole, or any part, of the claim allowed. The plain purpose of all those stringent provisions of the pension laws which the district attorney has read in your hearing, is to secure *absolutely* to the pensioner the bounty of the government. It cannot, on any pretext, be lawfully diverted, directly or indirectly, while on its way to the pensioner. It is not assets for the payment of debts, and can be in no way pledged or impounded for that purpose, and all dealings in that direction are null and void. There is a somewhat analogous policy which protects the salaries of the officers of the state and federal governments, and it is generally recognized everywhere. But here congress has, by the most stringent special legislation, sought to protect these pensioners, so munificently indowed, against all possibility of being defrauded by the agents they employ to collect their dues from the government. Nothing less than the unconditional payment of the full amount, less the small fee allowed, will discharge the agent from the penalties of this statute, whenever, by any

contrivance of his, he comes into possession of the warrants or the money they represent. All else is a wrongful withholding under this statute. It is the duty of the courts and juries to so enforce these legislative commands that there shall be no evasion of them." *U. S.* v. *Ryckman,* 12 FED. REP. 46.

Now, gentlemen of the jury, it is perfectly plain from these statutes and from these cases—not only the one cited, but many others—that in the prosecution of claims like this there can be no scheme whereby this statute may be evaded; and any contrivance that the ingenuity of the agent or attorney can devise, even with the consent of the party entitled to the pension, to pay a larger fee than $10, violates the statute. It is immaterial whether the pensioner consents to it or not; nor how much he may be willing to waive this statute, and pay the agent or attorney more than the law allows him. Under no possible construction of any contract that they make, or any agreement that the pensioner makes, can the agent receive or retain more than $10; and by no sort of contrivance or device, either under the disguise of a loan or the purchase of property or a gift, or any other scheme, can he demand or receive or retain any more than the fee allowed by law. The law protects this pension fund as long as the relation of the agent or attorney exists; and it makes no difference what the relation is, or how it is created,—whether by the ordinary contract of an agent and attorney, or by any implied contract of an agent and attorney, which he holds or sustains in the case. Any person who becomes instrumental in the prosecution of the claim and the collection of the money is liable under the provisions of these statutes, if violated. If the pensioner carries one of these checks to the bank, and the bank takes it for collection and collects the money, the bank becomes a person instrumental in the prosecution of that claim, and if the bank fails to pay it over, irrespective of any discount, the bank would be liable under this statute. If a person should find one of these pension drafts in the road, and thereby become the possessor and holder of it, and should undertake to collect it, and kept the money, he would become an instrument in the collection of that pension claim and would be liable. I am justified in ruling this way by a decision of the supreme court of the United States: A man became, under the state laws, guardian of one of these pensioners. He executed a bond and filed it under the state law. A pension to which his ward was entitled came to him, and, he having a right to collect, it was paid him by the treasury of the United States. Many years afterwards he refused to pay that money over. He was prosecuted under this statute for wrongfully

retaining pension money, convicted, and the conviction was sustained by the supreme court of the United States. That establishes, beyond controversy, the policy of these statutes and the stringency with which they are enforced by the courts. *U. S.* v. *Hall,* 98 U. S. 343.

Something has been said in the argument about these laws being unconstitutional. I cannot agree to that. No man has any claim to this money as a matter of *right*—no pensioner. It is paid to every pensioner as a bounty from the government. Every man, as a matter of duty, owes his services as a soldier to the government, and thousands of men render those services and never receive any compensation except while a soldier; but the government has allowed and does allow these pensions and these rewards to the soldiers themselves while they are disabled, and to those who are dependent on them when they are deceased. Then it is not a right; it is a bounty; and if the government chooses to say that the money shall go absolutely to the pensioner, irrespective of the claims of any creditor or any one else, it has a right to say so; and there is no doubt that such is the policy of the legislation, and that this is the spirit in which it has been administered by both the state and federal courts, both of which have ruled upon these points just as I am ruling now.

After the pensioner receives his money it is his own, and he may do with it what he pleases, except to pay to his agent or attorney any greater sum than $10, directly or indirectly. An agent or attorney cannot receive such payment directly or indirectly; if he does, he becomes liable under this statute, whether it is paid out of the pension fund or not. Outside of this the pensioner may lend him money or buy property of him, paying him for the same, whether it be with pension money or any other money, if it be a transaction made in good faith and not a device to evade this statute. But under any such device, no matter what form it takes, if this be the object, the statute is violated.

We will now come to the particulars of this case. The defendant here is indicted under six counts, the first four of which charge him with demanding, receiving, and retaining a larger fee than $10. The first charges him with demanding; the second, with receiving; the third, with retaining; and the fourth, with demanding, receiving, and retaining a larger sum than $10. The fifth and sixth counts charge him with wrongfully withholding a portion of the money. It is not necessary that there should be any formal demand. This statute

means that any request, direct or indirect, made by the agent for a larger fee than $10, is a violation of the statute; and any receipt of it which is a receipt for the purpose of violating this statute, and retaining or getting more than the law allows for his services, is unlawful. Of course, if the defendant receives the money for the purpose of depositing it in the bank, and he does that with it, this is not a wrongful receipt of it. If he receives it for the purpose of paying debts that the pensioner wants him to pay, that is not a wrongful receipt; but if he receives it for the purpose of appropriating it to the benefit of himself, the law implies, from the fact that he appropriates it to his own use after he receives it, an intention on his part to violate this statute, unless he can show to you that he has received it for some other purpose and applied it to that purpose. The same may be said of "retaining" the pension money or a portion thereof. If a person kept the money, with the consent of the pensioner, for any other purpose than retaining it for his own use, such retention would be lawful; but whenever it takes the form of appropriating it to his own use, the law implies an *animus* to violate this statute, and the only way to negative that is to show that it was received with some other intention and appropriated according to that intention.

With reference to the subsequent payment of the money that was made: The fact that a man retains the money and subsequently repays it is a fact which depends for its value on the circumstances under which the payment was made. Of course, if he retains the money but subsequently does pay it over, and there was a misapprehension of some contract or other circumstance like that, and payment is voluntarily made as soon as the matter comes to his knowledge, that kind of payment may be a circumstance from which the jury might infer that it was not his intention to retain the money wrongfully and in violation of this statute. But after the offense has been committed in wrongfully withholding the money, the mere fact that he repents and agrees to pay it back, either under the stress of threatened prosecution or of some demand that is made of him, would not relieve the offense of its criminal character. The subsequent payment must be made under circumstances that convince you that the original withholding was not for a wrongful purpose. If the refunding was made under circumstances which are inconsistent with the idea the original holding was rightful, such as being coerced by threats or demands for the return of the money or of a prosecution, the return of it would not cancel the offense. That fact might be considered in mitigation of the punishment, but with that you have nothing to do.

Coming now to the testimony in this case, if you believe the government's witnesses there can be no doubt whatever of the defendant's guilt. They testify beyond all question that the defendant did demand, receive, and retain a larger compensation for his services than $10. If they tell the truth about it there can be certainly no doubt of his guilt, and the only question with you will be whether or not on that evidence you will convict the defendant. Did they speak the truth and do you believe them, or do you believe the testimony of the defendant, offered to show that the transaction was a loan to him in good faith of the money, and not a retention, receiving, or demanding more than his legal fees? That is a question with which this court has nothing to do. It is entirely for you to determine. It is a function of yours upon which I would not trench, and I do not propose to say anything which would in any way influence your decision, and I wish to be very careful not to say anything which shall interfere with your determination of that question. But it is my duty to give you in charge certain rules for your guidance in weighing and testing the evidence on which you act.

The court then proceeded to charge the jury upon the rules for testing evidence and applying them to the testimony in this case,